# Exhibit
## 2

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 13, 2016

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   Cr.1:16-mj-24-AJ-1
              v.                *   March 7, 2016
                                *   2:30 p.m.
GERALD DELEMUS                  *
                                *
* * * * * * * * * * * * * * * * *



TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE ANDREA K. JOHNSTONE


For the Government:     Mark S. Zuckerman, Esq.
                        Assistant United States Attorney
                        53 Pleasant Street, 4th Floor
                        Concord, New Hampshire 03301


For the Defendant:      Jonathan Saxe, Esq.
                        Federal Defender's Office
                        The Ralph Pill Building
                        22 Bridge Street
                        Concord, NH 03301



Probation Officer:      Matt DiCarlo



Court Reporter:         Liza W. Dubois, LCR, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603)225-1442

```
1                        I N D E X

2

3                    Direct    Cross    Redirect    Recross

4   WARREN GROEN

5   By Attorney Saxe        23
    By Attorney Zuckerman            27

6

7   JOHN BURT
    By Attorney Saxe        28

8

9   DAVID BATES
    By Attorney Saxe        33

10

11  STEPHANIE MONZA
    By Attorney Saxe        35

12

13

14

15

16  EXHIBITS                           ID        In Evid.

17  Government's Exh. No. 1             6

18

19

20

21

22

23

24

25
```

<u>BEFORE THE COURT</u>

1

2        THE CLERK:  This court is now in session and

3   has before it a detention hearing in the matter of

4   United States of America vs. DeLemus, case number

5   16-mj-24-01-AJ.

6        THE COURT:  Before we get started with today's

7   hearing, Mr. DeLemus, there are just a few things that

8   I'd like to review with you again.  You don't need to

9   stand.  You can remain seated.

10        You may recall that the last time that we met

11   I instructed you on some of your rights regarding your

12   ability to remain silent.  So I just want to remind you

13   of those again.

14        You don't need to say anything in today's

15   proceeding.  If you do say anything, you should be

16   prepared that those statements may be used against you.

17   If you start to make a statement, you have the right to

18   stop at any time.  You are not required to make any

19   statements today.  Do you understand those rights?

20        THE DEFENDANT:  I do, ma'am.  Thank you.

21        THE COURT:  Okay.  Very good.

22        So there was also another preliminary issue

23   as to whether or not Mr. DeLemus wished to have his

24   detention hearing here or in the charging district.  I

25   am assuming that that matter's been resolved, but I just

1   want to make sure that it's clear for the record.

2           MR. SAXE:  Yes.  He's requesting it in this

3   district, your Honor.

4           THE COURT:  Okay.  Very good.  So with that,

5   let's proceed, and I'll turn it over to the Government.

6           MR. ZUCKERMAN:  Thank you, your Honor.

7           Your Honor, the United States is moving for

8   detention in this matter.  Last week, as the Court's

9   aware, I filed a memorandum supporting that position

10  which, as I pointed out in my Motion for Detention, was

11  prepared by the Assistant United States Attorney's

12  office in Nevada, where this indictment was brought.

13          By and large, your Honor, I am satisfied to

14  rest on the arguments made in that memorandum, but there

15  are a few points that I'd just like to highlight for the

16  Court, particularly in response to the memorandum that

17  the defendant filed on Friday afternoon.

18          The defendant, in his -- in his motion for

19  release, your Honor, focuses factually at least on the

20  argument that he was not present on April 12th of 2014

21  when the assault on federal agents and officers was

22  waged by the Bundys in the wash by the Bundy ranch.

23  That is certainly correct; he did not arrive until

24  sometime that evening, after the -- after the federal

25  officers had retreated in the face of considerable

1    firepower that was directed at them from both positions

2    of an overlook position, higher ground, as well as

3    direct confrontation on the ground.

4            However, in the days preceding that assault on

5    the 12th, the defendant was in touch with Cliven Bundy

6    on the 8th of April and based on his communications with

7    Cliven Bundy, resolved to go to the Bundy ranch to

8    support the Bundys' resistance to the court orders and

9    to the enforcement of those court orders which the

10   Bureau of Land Management was in the process of trying

11   to carry out.

12           He drove some 40 hours with heavy armaments

13   with him, including, as is depicted in the memorandum

14   that I filed, a .50 caliber sniper's rifle.  He stopped

15   along the way to line those guns, to zero in the sights

16   to ensure their accuracy, and then continued on to the

17   Bundy ranch, arriving there, as I say, in the evening

18   after that original assault on the federal officers had

19   taken place.

20           I think the memorandum does -- does justice to

21   explaining the circumstances under which that assault

22   took place and what the nature of the conspiracy was

23   that the defendant joined and that he is charged with,

24   but to further illustrate exactly what the federal

25   officers were facing that day, albeit before the

1    defendant arrived, your Honor, but which is -- but what

2    is indicative of the conspiracy that he joined, I have a

3    presentation.  I've provided a copy of this to defense

4    counsel before the hearing started.  I'd like to mark

5    this as an exhibit, if I may, for the Court.

6              THE CLERK:  Government's Exhibit 1 marked.

7         (Government's Exhibit No. 1 was marked for

8         identification.)

9              MR. ZUCKERMAN:  Your Honor, that is a printout

10   of a PowerPoint presentation of a series of photographs

11   that were taken on the 14th of April -- I'm sorry, on

12   the 12th of April of 2014 that show the number of guns

13   that were present at the -- at the time of the assault,

14   the wash positions that people took up -- I didn't mean

15   to erase that, sorry -- the wash positions that people

16   took up when the assault on the federal officers took

17   place, the snipers' positions that various members of

18   the group supporting Cliven Bundy and his family took up

19   on the overpass overlooking that wash with high-powered

20   weapons, and the confrontation itself in the wash area

21   with agents of the Bureau of Land Management, where the

22   confrontation directly took place with them under the

23   highway overpass and where the agents and officers of

24   the Bureau of Land Management eventually decided that

25   the better course of action was to back off and retreat

1  to avoid violence and an armed conflict with the

2  supporters of the Bundys.

3          It was after this event or shortly after that

4  event that the defendant arrived at the Bundy ranch and

5  immediately upon his arrival took up a position of

6  leadership in at least one of the camps where he was put

7  in charge of Camp Liberty, which is where a number of

8  other armed members or supporters of the Bundys were

9  camped out.  And he remained at the Bundy ranch for

10  three weeks, supporting their resistance to the lawful

11  orders of the federal court and to the efforts of

12  federal agents and officers to enforce those lawful

13  orders.

14          He also explained, publicly, several times,

15  what his intentions were in being there and some of his

16  statements are outlined in the memorandum that was

17  filed.  Particularly at page 14 of the memorandum that I

18  filed last week, the defendant was quoted from an

19  interview that he gave while he was there, explaining

20  exactly why he was there and what his intentions were

21  and what he was prepared to do.  And he said, "What we

22  are out here to do is to keep the federal government,

23  that is acting in a lawless nature, from shooting the

24  Bundys or anyone else.  If, in fact, the federal

25  Government and their agencies come after the Bundys and

1   shoot at them, we will defend the Bundys.  Absolutely,
2   and we have all the capability in the world to do that.
3   Do we want to do that?  Absolutely not.  What we will do
4   is we will all die right here in place to defend the
5   Bundys and the freedom of this country.  And if nobody
6   else in this country will stand up, by God, you can look
7   around here and see what true heroism is."
8            So the defendant was unambiguous in his
9   statements publicly that the reason he was there was to
10  take up arms against the United States Government, which
11  he considered, in his mind, to be acting lawlessly, and
12  to use such force, including deadly force, as he saw fit
13  to respond to what he perceived as lawless action.  He
14  supported that effort by bringing a number of weapons
15  with him to the Bundy ranch, including, as I mentioned,
16  that .50 caliber sniper's rifle, which is depicted in
17  two different photographs in the memorandum that I
18  filed.
19           And, your Honor, with respect to
20  dangerousness, I think our argument could almost begin
21  and end just with that weapon.  That weapon really has
22  two purposes; to kill with extreme prejudice and to
23  intimidate, to let somebody know that I can take you out
24  from a great distance.  That's a weapon that can -- that
25  can accurately take out a target, kill its target, from

1    many, many hundreds of yards away.  Just introducing a

2    weapon of that force, of that magnitude, into the

3    standoff at the Bundy ranch speaks volumes as to the

4    defendant's intentions.  That is not a defensive weapon.

5    That is assaultive weapon.  That is a weapon of

6    offensive tactics, not defensive tactics, and he's

7    proudly depicted having that weapon with him on site.

8    And, as the other quotes in the -- that are cited in the

9    memorandum I filed illustrate, he was ready, willing,

10   and able if, in his mind, the situation called for it,

11   to use that level of deadly force against federal

12   agents.

13           Part of his duties, as is outlined in the

14   memorandum, was to provide security and an armed escort

15   to other members of the standoff who were going out,

16   rounding up the Bundys' cattle, strays or calves, that

17   the BLM had to abandon when they retreated from the

18   property.  And there is a Facebook posting which is

19   contained in -- on page 17 of the memorandum that I

20   filed last week that speaks directly to that activity.

21           And he says that as he followed the pickup

22   truck that he was providing an armed escort to, with

23   seven folks in the vehicle that he was in to provide

24   protection, it dawned on him that the folks he was

25   trying to protect, in his mind, were just trying to go

1  to work and that he had to protect them against our own

2  government.

3         So he is in that own Facebook posting, in his

4  own words, saying exactly what he was doing.  He was

5  providing an armed escort to people who were in the

6  process of violating the law, of disregarding lawful

7  court orders, several of them, that had been issued over

8  the years, and was ready to defend them by using force

9  against federal agents who may try to interfere with

10  their unlawful activities in trying to secure cattle

11  that the federal government was at that point, after

12  much litigation, trying to -- trying to obtain and

13  forfeit for purposes of settling the ongoing dispute

14  about grazing fees with the BLM.

15         So I raise all these points or highlight these

16  points, your Honor, to emphasize the issue of

17  dangerousness that the defendant poses.  It is true that

18  this activity happened in 2014 and that but for the

19  recent -- the defendant's recent trip out to Oregon for

20  the standoff that occurred there, he has not been

21  engaged in like activity.  And when he went out to

22  Oregon, I'm certainly not suggesting that he went out

23  there in any way, shape, or form as he did when he went

24  to Nevada.  He did not go out there armed.  He went out

25  there ostensibly to talk to the folks who were involved

1   in that standoff, and he told the FBI that he was going

2   out there to talk to them.

3         Nevertheless, I don't think that it's

4   appropriate to discount the defendant's conduct in 2014

5   or his statements about his willingness to use force

6   against the federal government lawfully exercising its

7   powers to enforce lawful court orders and suggest that

8   just because he left the Bundy ranch after some three

9   weeks, somehow his dangerousness has dissipated.  What

10   the defendant demonstrated is that, in his mind, he can

11   make the decision about when the federal government is

12   acting lawfully or lawlessly.  And if in his mind it is

13   acting lawlessly, then, in his mind, he is perfectly

14   within his rights to take up arms against federal agents

15   and federal officers.  That's dangerousness as broadly

16   and as precisely as I think it could possibly be

17   defined.

18         It also, your Honor, speaks to the issue of

19   whether the defendant would be willing to submit to the

20   court order to appear in Nevada to answer these charges

21   because, as he demonstrated when he went out to the

22   Bundy ranch, he is dismissive of lawful court orders.

23   And if in his mind he deems them to be unlawful,

24   unenforceable, contrary to the constitution as he

25   interprets it, then he does not have to abide by it.

1    And he was supporting the Bundys who took exactly that

2    approach to the lawful court orders that were handed

3    out, handed down to them, many of them, that ultimately

4    gave rise to the -- to the assault on the federal

5    officers and the standoff that ensued.

6              So given his conduct, given his public

7    pronouncement about his conduct, I think it is highly

8    unlikely that there are any conditions or combination of

9    conditions that could assure his appearance in Nevada to

10   answer these charges or that would adequately assure the

11   safety of the community from the defendant's conduct.

12   And for those reasons, your Honor, we move for

13   detention.

14             I do note that the defendant in his memorandum

15   addressed certain legal arguments about whether the --

16   in particular, the Section 924(c) charges would stand as

17   a matter of law.  I would respectfully submit to this

18   Court that those issues are best addressed in Nevada,

19   where this case has been brought, and where they can be

20   fully litigated by the U.S. Attorney's Office there, and

21   the defendant before the Court that will be hearing this

22   case in Nevada.

23             But I would also point out, your Honor, that

24   the defendant is charged in this indictment with

25   Section 111 violations, assault on a federal officer,

1    which are themselves crimes of violence and even short

2    of the 924(c) charges, would trigger the presumption for

3    detention that is present in this case.

4           But that is the summary of argument, your

5    Honor.  Beyond that, I would rest on the memorandum that

6    we filed.

7           THE COURT:  Okay.  Very good.  Thank you.

8           Attorney Saxe --

9           MR. SAXE:  Yes, your Honor.

10          THE COURT:  -- do you want a few minutes?

11          MR. SAXE:  No, I'm okay.

12          THE COURT:  Are you all set?

13          MR. SAXE:  Your Honor, I think that to

14   understand this case, perhaps the best way is to do what

15   actually the Government did in its pleading, initial

16   indictment, and the sentencing memo.  And what it did is

17   the broke the alleged conduct down into what happened

18   well in advance of April 12th, 2014.  And there was I

19   don't know how many dozens of paragraphs that had to do

20   with that particular conduct which involved the Bundys

21   and some other individuals out there and did not in any

22   way, shape, or form involve my client at all.  He had

23   absolutely nothing to do with that.  And that is a large

24   part of the factual allegations in the indictment and a

25   large part of the substance of the Government's motion

1   for detention.

2        The second, which seems to me to be the most

3   important issue from the Government's perspective, is

4   what happened on actually April 12th, 2014.  And then I

5   would call your attention to what happened or what, for

6   lack -- what didn't happen after April 14th, 2014 (sic).

7        So my client had -- whatever the dispute was

8   about cattle and grazing and not paying fees, my client

9   had nothing to do with that.  They're not even alleging

10  he had anything to do with that.

11       There was also a situation whereby the

12  Government had made arrangements with private

13  individuals to broker or auction the cattle once they

14  were removed from the property and there was some

15  allegations that Mr. Bundy and some of the people

16  associated with him intimidated, if you will, these

17  private people that were going to be engaged to sell

18  the cattle.  And that all happened well in advance of

19  April 12th, 2014, and my client had nothing to do with

20  that.

21       Now, what happened on April 12th, 2014, which

22  the Government missed -- my client wasn't even there.

23  My client did not know that there even had been a

24  confrontation.  There's a presumption here that my

25  client was planning to be part of this confrontation

1   which took place on April 12th, 2014.  He never even

2   knew there was that confrontation on April 12th, 2014.

3   He didn't know that until after he got there.

4          So I see some disturbing pictures there, but

5   he didn't have anything to do with that.  He didn't know

6   that was going to happen and he didn't know that it did

7   happen until after he got there.

8          Now, when he got there, I would argue that he

9   served as a voice of reason, and the evidence is that

10  nothing else happened.  Okay?  After he arrived -- I

11  don't know that he's responsible for nothing else

12  happening, but the fact is that nothing else happened

13  after he arrived.  He stayed there for a couple of weeks

14  and then he returned home.

15         Now, when was that?  That was two years ago

16  almost, your Honor, or one year and 11 months, almost

17  one year and 11 months ago.  So what has happened in

18  that one year and 11 months with respect to my client

19  and with respect to any evidence of dangerousness on his

20  behalf?  Well, I would submit to you that nothing

21  happened.  Okay?

22         He's 61 years old.  He was in the Marines for

23  six years.  He honorably served his country.  He is very

24  interested in governance and he is very interested --

25  he's a Republican, and I would describe him as a

1  right-wing Republican in the sense that he's very

2  religious and he shares a lot of the views of people

3  that are right-wing Republicans.  There's nothing wrong

4  with that any more than there's people that are

5  left-wing liberals.  But what he has done is he's

6  surrounded himself with people that do it the right way,

7  that go through the political process.  All right?  His

8  wife is a representative.  There are several other

9  people in the audience here today that are

10  representatives.  They're elected officials.  He

11  associates himself with people like that so he can do

12  things the right way and not the wrong way.  All right?

13          So he -- he did not engage in a conspiracy

14  with these people to assault federal officers because he

15  did not know that federal officers, if they were, were

16  going to be assaulted.

17          What else happened in the, say -- we'll say

18  two years since 2014?  I would say that -- that actions

19  speak louder than words.  And the Government sits here

20  today and asserts that he should be detained because

21  he's dangerous, but the Government knows that he's not

22  dangerous because he's been out for two years.  He has

23  been communicating with the FBI.  He has been doing

24  nothing whatsoever wrong.  He's been doing the whole

25  thing he's done his entire 61 years, which is live a

1    life that is law-abiding.

2           Another thing that I think is very significant

3    that happened in the last two years is that there was --

4    as you're aware, there was an incident in Oregon at the

5    Mueller Federal Wildlife Reserve in Harney County,

6    Oregon, wherein some of the associates of Mr. Bundy took

7    over a wildlife preserve.  I'm sure you're aware of

8    that.  Everybody's aware of that.  So he thought that

9    that was wrong.  He contacted Philip Christiana of the

10   FBI and said, I'm going to go out there because I want

11   to talk these people down because I think they're doing

12   the wrong thing.  And then he flew out there on his own

13   dime.  And then he also talked to some people in the FBI

14   while he was there.

15          He then went to the wildlife preserve and he

16   told the people, you need to leave; this is wrong; you

17   need to deal with this in the court system; and he tried

18   to act as a go-between.  It didn't work, but he tried to

19   act as a go-between.  He went -- while he was out there,

20   he went there twice and he had the same conversation

21   with these people.  And the reason he did it is he knows

22   these people and he was hoping that they would listen to

23   him and leave.  And he pleaded with them again, look,

24   you need to leave, this is wrong, you need to deal with

25   this through the legal process, just like he and his

1  family and the people that he associates with in

2  New Hampshire are trying to, you know, have their

3  political views put into life through electing people

4  through the -- the democratic process of electing

5  people.

6           So then he returned New Hampshire.  Now, one

7  thing I forgot is while he was out there in 2014, he

8  actually went and spoke with members of the Mesquite

9  Police Department.  He went to the police department to

10  talk to them and to see what was going on, to try to get

11  some idea, to try to -- to try to diffuse things.  And,

12  again, whether or not it was because of him, there

13  wasn't any further confrontations after he got out there

14  and he -- he then subsequently returned.

15           Regarding the 924(c) charges and the *Johnson*

16  case that I referenced in my pleading, I did that

17  because one of the issues, your Honor, that -- as you

18  know, that you're directed by the statute to look at is

19  the strength of the Government's case.  I would submit

20  to you that that's not the strength of the Government's

21  case against somebody else, because there's a number of

22  counts in the indictment that don't even charge my

23  client, but it's the strength of the case against my

24  client.  And I would argue -- I would argue that it's

25  not strong.  Those three 924(c) charges have as a

1   predicate offense a violation of 18 U.S.C. 372.  That's

2   the predicate for Count III, which is the 924(c) count

3   charging my client.  And the predicate offense for

4   Count VI, which is the 924(c) count charging my client,

5   is a violation of 18 U.S.C. 111(a)(1)(b); and the

6   predicate for Count XV, which is the 924(c) count

7   charging my client, is 18 U.S.C. 1951.

8           It's an issue -- if those are not crimes of

9   violence anymore, then there's no merit to those charges

10  whatsoever.  So you can -- we don't have to -- you can

11  consider that and I'm asking you to consider that.  And

12  I would point out that there's a -- that Nevada is in

13  the 9th Circuit and there's a case from Nevada which I

14  cited in my -- in my bail memo called *Dimaya*,

15  D-i-m-a-y-a, vs. *Lynch*, L-y-n-c-h.  It's 803 F.3d 1110,

16  and that's a 2015 case.  And they said in that case that

17  the -- that the crime of violence language in 18 U.S.C.

18  16(b) is the identical language that's in the 924(c)

19  statute as far as the residual clause goes and that they

20  both suffer from being unconstitutionally vague.

21          So we're not going to obviously litigate that

22  issue today, but I think the fact that that's in the 9th

23  Circuit and Nevada's in the 9th Circuit has an impact on

24  the strength of the Government's case.

25          Also, Mr. Zuckerman mentioned that my client

1    was charged with assaulting the federal officer.  My

2    client wasn't even there when that happened and he

3    didn't know that it happened and, in fact, didn't know

4    that it had happened until he got there.

5            So I would suggest that whether or not the

6    evidence is strong against the Bundys and some of the

7    other named defendants, the evidence is not that strong

8    particularly with regard to some of the counts against

9    my client and that is something that I would ask the

10   Court to consider.

11           I would also ask the Court to consider that,

12   as I mentioned before, he served six years in the Marine

13   Corps.  He was honorably discharged.  He has no record.

14   He has no involvement with the criminal justice system

15   except that he ran for sheriff, unsuccessfully, in --

16   2015?

17           THE DEFENDANT:  '14.

18           MR. SAXE:  2014.

19           He has no issues with drugs or alcohol.  He is

20   devoutly religious.  He has ties to the community.  And

21   the only thing that he did in the preceding -- in the

22   past two years is evidence that he's peaceful and he

23   wants to try to resolve any of these conflicts in a

24   peaceful way by going out to Oregon to try to diffuse

25   the situation there.

1          There are -- as far as a danger to the

2     community, your Honor, here's his community.  And some

3     of the other part of the community is in the other

4     courtroom because there's not enough room for them all

5     here.  They know him.  These are people that are

6     law-abiding, that are members of the House of the State

7     of New Hampshire.

8          I've asked -- they all want to say something,

9     but I said that's not really feasible here.  But there's

10    a few people who I've -- who have selected themselves,

11    actually, that would just want to briefly address the

12    Court, if I could do that at this point.

13          THE COURT:  I think that what we need to be

14    sure is that if you're going to ask individuals to come

15    forward and make statements, they're subject potentially

16    to cross-examination if they're giving testimony.

17          MR. SAXE:  Whatever you want, your Honor.

18    I -- I talked to them.  I said, usually what happens in

19    a situation like this is people just stand up from the

20    back of the courtroom and address the Court.  But if you

21    would prefer to have them testify, that's fine.

22          THE COURT:  Well, here's my -- my problem.

23    I'm looking around this room and I know that there are

24    folks that are in the other room.  And so if we simply

25    pick and choose who's going to have an opportunity to

1    speak, that doesn't really seem fair to everyone that's

2    here today that probably everyone has something that's

3    on their mind that they'd like to say.

4            So if individuals want to come forward and

5    provide testimony as it relates to this detention

6    hearing, I am happy to do that.  I think it's fair for

7    the Government to have an opportunity to cross-examine

8    them if they wish to do so.

9            MR. SAXE:  That's fine, your Honor.

10           THE COURT:  All right.  Very good.

11           MR. SAXE:  That's fine.  Yeah.  Okay.

12           I would ask Warren Groen ...

13           THE CLERK:  If you could please remain

14   standing and raise your right hand.

15           **WARREN GROEN**, having been first duly sworn,

16   testified as follows:

17           THE CLERK:  Thank you.  Please be seated and,

18   for the record, please state your name and spell your

19   last name.

20           THE WITNESS:  My name is Warren Groen, last

21   name is G, as in George, r-o-e-n.

22                   DIRECT EXAMINATION

23   BY MR. SAXE:

24       Q.   Okay.  Mr. Groen, do you know my client?

25       A.   I do.

1      Q.   And how do you know him?

2      A.   I met him approximately ten years ago

3  involving community activities.  We've done some

4  volunteer work together and -- and at political

5  meetings.

6      Q.   Okay.  And are you involved in politics?

7      A.   I am.  I'm a state rep.  I represent Strafford

8  District 10 in Rochester.

9      Q.   Okay.  And how long have you done that?

10     A.   In my eighth year.

11     Q.   Okay.  And do you know my client's wife?

12     A.   I do.  I serve with her currently in the House

13  and I did four years ago.

14     Q.   Okay.  And what's her name?

15     A.   Her name is Susan.

16     Q.   Okay.  So how often do you interact with

17  Mr. DeLemus?

18     A.   Sometimes weekly, sometimes, you know, once or

19  twice a month, depending on how much activity there is

20  going on.

21     Q.   Okay.  Do you think that you've met him and

22  dealt with him enough to form an opinion about his

23  personality?

24     A.   I have.

25     Q.   Okay.

1    A.    It doesn't take long when you meet Jerry to

2  form an opinion.  He's a Patriot and he holds his views

3  strongly.  And I hope that's not a problem in this

4  country.  If it is, there's -- you know, the audience in

5  this room and the next room's in big trouble.

6    Q.    Okay.  So -- so obviously you've heard from --

7  you've discussed this with me prior to today, right?

8    A.    Uh-huh.

9    Q.    I talked to you on the phone.

10   A.    Yes.

11   Q.    And you've heard the Government make a

12 presentation regarding the Government's position here?

13   A.    I have.

14   Q.    The Government is claiming that they believe

15 that Mr. DeLemus is violent.  Do you think Mr. DeLemus

16 is violent?

17   A.    Absolutely not.  And I've actually seen

18 evidence to the contrary.  I think it was about four

19 years ago when we were campaigning, we were doing a sign

20 wave in downtown Rochester --

21   Q.    Would you tell the Court what that means?

22   A.    Oh, a sign wave is where we all take our

23 various signs from the different candidates and we stand

24 along the street and we wave our signs at the cars that

25 are going by.

1      Q.   Okay.  So they were, I assume, Republican

2   candidates?

3      A.   They were.

4      Q.   Okay.  So what happened?

5      A.   A group of Occupy New Hampshire people came

6   and got all in the middle between us and started

7   jostling and basically trying to make trouble.  And, as

8   a matter of fact, they were successful.  They did make

9   trouble.  And there was a couple of folks on our side

10  who were ready to engage in fisticuffs, I guess we could

11  say, and Jerry immediately stood up and got in the

12  middle of it and stopped it all.

13           And so I would say that he's not a

14  peacekeeper, he's a peacemaker --

15      Q.   Okay.

16      A.   -- because he actually made peace when it no

17  longer existed.

18      Q.   Okay.

19      A.   And I observed that myself.

20      Q.   Do you think that -- do you think that if he

21  was released that he would run away?

22      A.   No.  He's a man of his word.

23      Q.   Okay.  Do you think that if this Court imposed

24  conditions for his release that he would abide by those

25  conditions?

1      A.    He would.

2      Q.    And why do you think that?

3      A.    My ten years of experience with him and

4  numbers of volunteer events.  We've done construction

5  jobs that we were, you know, both volunteering on

6  together, volunteer events where we did political

7  events, and he's always been a man of his word.

8           MR. SAXE:  Okay.  Thank you.  I don't have any

9  further questions, your Honor.

10          THE COURT:  Any questions?

11          MR. ZUCKERMAN:  Just briefly, your Honor.

12          THE COURT:  Certainly.

13                    CROSS-EXAMINATION

14  BY MR. ZUCKERMAN:

15     Q.    Good afternoon, Mr. Groen.  My name is

16  Mark Zuckerman.  I'm the prosecutor on this case, at

17  least in this district.  I just have one or two

18  questions for you.

19          You say Mr. DeLemus is man of his word; is

20  that correct?

21     A.    Indeed.

22     Q.    So he says what he means and he means what he

23  says?

24     A.    Uh-huh.

25          MR. ZUCKERMAN:  Okay.  Thank you.

1          THE COURT:  Thank you very much, sir.  I

2    appreciate your time.

3                    (Witness excused.)

4          MR. SAXE:  I would call John Burt.

5          THE CLERK:  Please remain standing and raise

6    your right hand.

7          **JOHN BURT**, having been first duly sworn,

8    testified as follows:

9          THE CLERK:  Please be seated and, for the

10   record, please state your name and spell your last name.

11         THE WITNESS:  I am Representative John Burt,

12   and it's B-u-r-t.

13                  DIRECT EXAMINATION

14   BY MR. SAXE:

15     Q.   Okay.  And, Mr. Burt, do you know

16   Jerry DeLemus?

17     A.   I do.

18     Q.   And how do you know him?

19     A.   I was elected the same time his wife

20   Honorable Susan DeLemus was and I met him through her.

21     Q.   Okay.  And how long ago was that?

22     A.   2010.

23     Q.   All right.  And have you had -- how much

24   contact have you had with Jerry?

25     A.   Over the years, it was off and on.  You know,

1   I've always followed Jerry on Facebook and then also

2   through phone calls and et cetera.  At the beginning, we

3   both did debates, which -- you know, had candidates

4   come, so I met, you know, Jerry many times through

5   there.

6           Our conversations, you know -- the Honorable

7   Susan DeLemus, you know, conversations with her over the

8   last, you know, it'd be six years now.

9       Q.   Okay.  And have you seen Jerry interact with

10  other people in the community?

11      A.   Many times.

12      Q.   Have you ever known him to behave in a violent

13  manner?

14      A.   Zero.

15      Q.   Okay.  What would you say -- how would you

16  describe his involvement with his community?

17      A.   I think he's very well respected in his

18  community.  I think people respect him.  They understand

19  who Jerry DeLemus is, that he's a man of his word and

20  law-abiding.

21      Q.   Okay.  And do you respect him?

22      A.   Oh, absolutely, 100 percent.

23      Q.   And why do you respect him?

24      A.   Well, I've got a small statement I was going

25  to read, but why I respect him is, you know, because of

 1    his strong family values and his belief in God.

 2              MR. SAXE:  Okay.  And, your Honor, would it be

 3    okay if he just read the statement --

 4              THE WITNESS:  It's very short.

 5              THE COURT:  I don't have an objection to that.

 6    Go ahead.

 7              MR. SAXE:  Okay.  Go ahead.

 8              THE WITNESS:  Thank you, sir, and thank you,

 9    Your Honor.

10              I wrote this myself last night.  My wife did

11    help me correct some spelling, because I'm a terrible

12    speller.  So other than that, this is my words.

13              Thank you, Your Honor.  I am Representative

14    John Burt of Goffstown, New Hampshire.  I represent

15    Hillsborough 39; Goffstown, Weare, and Deering.  I was

16    elected in 2010 along with the Honorable Susan DeLemus

17    of Rochester, New Hampshire.  I met Jerry shortly after

18    that.

19              Mr. DeLemus is one of the most law-abiding

20    Americans I have ever met.  He served his country with

21    honors in the military to protect my grandchildren and

22    all Americans' freedoms.  I thank him for that.  Sadly,

23    the Honorable Susan DeLemus's mother has Alzheimer's and

24    she now lives at their home.  Mr. DeLemus helps her

25    care, and only with his help can the Honorable Susan

1   DeLemus continue to serve as a volunteer legislator.

2   She serves her position with honor, your Honor.

3           The many times I have visited with the

4   Honorable Susan DeLemus and her husband, I saw a true --

5   two true Americans.  I have always respected Mr. DeLemus

6   for his strong family values and his belief in God.

7           When Mr. DeLemus and I talked about any issue

8   in America that we thought were not right, he always

9   talked about the peaceful and law-abiding way to correct

10  it.  Mr. DeLemus loves America, loves New Hampshire,

11  loves his wife.  I have zero doubt about that and I

12  would put my reputation on the line.

13          Your Honor, I ask you to look at how many

14  good Americans are sitting here today that support

15  Mr. DeLemus.  I have never been in a federal court in my

16  55 years of life other than last Thursday when I sat

17  before you for the same reasons.  To show you that

18  Mr. DeLemus is a law-abiding true American, being here

19  with all these law-abiding Americans here today, your

20  Honor, in support of Mr. DeLemus, makes me proud to know

21  Mr. DeLemus.  Your Honor, I just cannot tell you enough

22  what Mr. DeLemus has done for this great nation of ours

23  and the respect that he has in our communities and the

24  respect that I have for Mr. DeLemus.

25          Thank you for allowing me to speak about this

 1    great American, Mr. DeLemus.

 2                THE COURT:  Proceed.

 3                THE WITNESS:  Thank you.

 4    BY MR. SAXE:

 5         Q.   So here's the question.  If the Court releases

 6    him and imposes conditions, do you -- in your opinion,

 7    based on your knowledge of him, do you think that he

 8    would obey those conditions?

 9         A.   He definitely would obey those conditions.

10    And, you know, I would let him move right into my house.

11         Q.   Okay.  And do you think he would run away?

12         A.   Absolutely not.  He's a man of his word.

13                MR. SAXE:  Okay.  Thank you very much.  No

14    further questions.

15                THE WITNESS:  Thank you, sir.

16                MR. ZUCKERMAN:  I have no questions, your

17    Honor.  Thank you.

18                THE COURT:  Thank you, Mr. Burt.

19                THE WITNESS:  Thank you, your Honor.

20                     (Witness excused.)

21                MR. SAXE:  I have two more witnesses, your

22    Honor, both brief.

23                THE COURT:  Okay.

24                MR. SAXE:  The first one is David Bates.

25                THE CLERK:  Please remain standing and raise

1    your right hand.

2            **DAVID BATES**, having been first duly sworn,

3    testified as follows:

4            THE CLERK:  Please be seated and, for the

5    record, please state your name and spell your last name.

6            THE WITNESS:  My name's David Bates, last name

7    is spelled B-a-t-e-s.

8                    DIRECT EXAMINATION

9    BY MR. SAXE:

10       Q.   Mr. Bates, do you know Jerry?

11       A.   Yes, I do.

12       Q.   How do you know Jerry?

13       A.   I've been a state representative since 2008

14    and came to know Jerry through serving in the

15    Legislature with his wife Sue.

16       Q.   And how -- and what district do you represent?

17       A.   I represent Rockingham District 7, which is

18    the town of Windham.

19       Q.   Okay.  And in -- in that period of time that

20    you've known him, how frequently do you come into

21    contact with him?

22       A.   It's hard to quantify that.  I've had numerous

23    occasions where I've been in contact with Jerry over the

24    years, primarily at political-type events, rallies at

25    the Statehouse, and things of that nature.

1    Q.   Okay.  And have you seen him interact with

2  other people in the community?

3    A.   Absolutely.  Many times.

4    Q.   And -- and have you seen him interact with

5  community enough to be able to form an opinion about him

6  as a personality?

7    A.   Yes, I have.

8    Q.   Okay.  What's your opinion?

9    A.   I believe Jerry is a man of integrity and

10  honor and someone who I would have no hesitation in

11  vouching for.

12    Q.   Okay.  Do you -- obviously you understand that

13  the issue which the Court has to address here is whether

14  he is so violent that he should not be released pending

15  the resolution of this case.  Do you think he's a

16  violent person?

17    A.   No, I do not believe he's a violent man at

18  all.

19    Q.   Okay.  And why do you say that?

20    A.   One of the ways in which I've come to know

21  Jerry and especially his wife is through weekly meetings

22  in the Statehouse prior to House sessions.  We would

23  regularly gather before House sessions for a prayer

24  meeting, just to pray for things going on in the

25  Legislature and the various legislators themselves.

1    I've come to know Sue and Jerry both as people of deep

2    faith and the idea of him being a violent person is

3    wholly inconsistent of what I know of him as a Christian

4    that is very devout.

5        Q.    All right.  Do you think if the Court was to

6    impose conditions that he had to abide by that he would

7    obey those conditions?

8        A.    Absolutely.  You've heard previously, your

9    Honor, that Jerry has honorably served this country as a

10   Marine.  He knows what it means to receive and to follow

11   orders and there's no question in my mind that he will

12   abide by whatever conditions that this Court makes upon

13   his release.

14            MR. SAXE:  Thank you, Your Honor.  I have no

15   further questions.

16            MR. ZUCKERMAN:  I have no questions, Judge.

17   Thank you.

18            THE COURT:  Very good.  Thank you.

19                 (Witness excused.)

20            MR. SAXE:  Your Honor, I have one more

21   witness, Stephanie Monza.

22            THE CLERK:  Would you please remain standing

23   and raise your right hand.

24            **STEPHANIE MONZA**, having been first duly sworn,

25   testified as follows:

1          THE CLERK:  Thank you.  Please be seated and,

2     for the record, please state your name and spell your

3     last name.

4          THE WITNESS:  Stephanie Monza, M-o-n-z-a.

5                    DIRECT EXAMINATION

6     BY MR. SAXE:

7          Q.   Ms. or Mrs.?

8          A.   Mrs.

9          Q.   Mrs. Monza, do you know Jerry?

10         A.   I know Jerry.

11         Q.   How do you know Jerry?

12         A.   Jerry has been my neighbor and friend for 13

13    years.

14         Q.   Okay.  When you say neighbor, you live right

15    next door or a couple houses away?

16         A.   We live next door.  And then since his

17    mother-in-law's had Alzheimer's, they're in the back.

18    We live in condos, so we're close by.

19         Q.   Okay.  And I know I told you you probably

20    wouldn't testify.  I apologize for that.

21         A.   That's okay.

22         THE COURT:  Blame it on me.

23         Q.   Most of the people that support Jerry are

24    Republicans.

25         A.   Oh, boy.

1      Q.    Are you a Republican?

2      A.    I am a Bernie supporter.

3      Q.    As in Bernie Sanders?

4      A.    As in feel the Bern, Bernie Sanders, yes.

5      Q.    Don't hold that against her.

6            So all right.  So -- but you're his next door

7      neighbor, right?

8      A.    Yes.

9      Q.    So -- and you see him, I assume, on a regular

10     basis?

11     A.    All the time.

12     Q.    Could you just describe to the Court the

13     nature of your interactions with him over the years?

14     A.    Jerry -- all I can think of is when you see

15     these bumper stickers that say random acts of kindness,

16     that's Jerry.  He does it every day.  There have been

17     times where I -- my husband had to leave to go to

18     Florida, I was alone like most of the winter a few

19     winters back.  Jerry and Sue are just -- they're not

20     even neighbors; they're family.  I mean, whatever I

21     need, 2:00 in the morning, I could call Jerry and he'd

22     be there in a heartbeat.

23           But I have kind of a knee-jerk reaction to

24     things where if I get upset, I'm like, boom.  Jerry

25     would be the first one to say, hey, Steph, sit back,

1    calm down, think about it.  And that's how he is.

2              I mean, I hear people say violent.  Jerry is

3    anything but violent.  I mean, I've never, ever seen him

4    raise his voice and that's the honest to God truth.   In

5    13 years, I have never seen that man upset.  Ever.

6         Q.   Okay.  And do you think that if this Court

7    were to impose conditions that he would abide by those

8    conditions?

9         A.   Of course he would.

10        Q.   Do you --

11        A.   Of course he would.

12        Q.   Do you think that he would show up in Nevada?

13        A.   Yes.  He would do whatever was ordered of him

14   to do.  But he's -- he's one of the kindest -- and Sue

15   together.  They adore each other.

16             And as far as Jerry, I mean -- there are

17   instances where I could list for a very long time, I

18   could be here for half an hour or more.  But one of the

19   things that come to mind, and it came to my mind earlier

20   today, was that my mom was in Hospice care a few years

21   back.  And I called home and I couldn't reach my

22   husband.  So I called Jerry and Sue and said, could you

23   please go and see if he's there, I really need him right

24   now at the hospital.  Well, they couldn't find him, but

25   15 minutes later, Sue and Jerry were right there in that

1  hospital room with me, you know, asking what I needed.

2        My dog was -- Jerry's a real animal person,

3  like I am, and my dog was dying and I couldn't get him

4  up off the floor.  He was a pretty big dog.  I called

5  and Jerry came over, tears in his eyes, put the dog in

6  the car for me.  And when he passed away, the first

7  people that were over there were Jerry and Sue with a

8  bouquet of roses and sat with me until I, you know,

9  calmed down.  That's how they are.

10        I mean, I could go on, if you would like.

11        MR. SAXE:  I don't have any other questions.

12  Thank you very much.

13        THE WITNESS:  Okay.  Thank you.

14        MR. ZUCKERMAN:  I have no questions, Judge.

15        THE COURT:  Thank you very much.

16              (Witness excused.)

17        MR. SAXE:  That's all I have, your Honor,

18  other than to say it is not insignificant that this case

19  is two years old and it is not insignificant that the

20  Government didn't feel that he was so dangerous that

21  something had to be done during that two-year period to

22  prevent Mr. DeLemus from being out in the public because

23  he was so dangerous.  And the reason is because he's not

24  dangerous.  And the reason is because if you order him

25  to go out to Las Vegas or to Nevada, he's going to go.

1     And he's not going to be violent.  He's going to do what

2     he's done his entire life; he's going to -- if you order

3     him to abide by conditions, he's going to abide by them.

4     And he'll go out there and he'll do whatever he has to

5     do to face these charges.

6              I don't think he's a danger to the community

7     and I --- or a flight risk and I think that you can

8     definitely devise conditions which would reasonably

9     assure the safety of the community and his appearance

10    because I don't really think it's necessary to really

11    have any conditions because he's just not a danger or a

12    flight risk.  And I would ask that he be released.

13             THE COURT:  Thank you.  Does the Government

14    have anything further?

15             MR. ZUCKERMAN:  No, no further evidence, your

16    Honor.  I'd rest on our argument.

17             Again, the defendant's conduct back in 2014

18    does speak for itself.  And as several witnesses said,

19    Mr. DeLemus is a man of his word; he says what he means,

20    he means what he says.  And we know what he said about

21    the use of force that he was prepared to use against the

22    U.S. Government.

23             THE COURT:  Thank you.  So the Court has

24    before it the Pretrial Services Report and I've reviewed

25    that and I've also reviewed the submissions that were

40

```
 1   provided to me by both the Government and by

 2   Mr. DeLemus's counsel.

 3           The purpose of today's hearing is not to

 4   decide Mr. DeLemus's guilt or innocence.  It's really to

 5   look at a very narrow issue and that is whether or not

 6   Mr. DeLemus should be detained pending trial or whether

 7   there are some conditions or a combination of conditions

 8   that can be set that will reasonably assure his

 9   appearance and that will reasonably assure the safety of

10   the community.

11           That is not an insignificant undertaking.

12   There is a significant amount of information that's been

13   provided to the Court, both in this hearing and in the

14   materials that have been submitted, and so I am going to

15   take this matter under advisement.  I will issue my

16   order after I've had an opportunity to further consider

17   the matter.

18           And, in the interim, Mr. DeLemus, you'll

19   continue to be detained until such time as I issue my

20   order.  So I will remand you to the custody of the

21   United States Marshal and I will take this under

22   advisement.

23           I thank everyone very much for their time and

24   for coming here today.

25           (Proceedings concluded at 3:23 p.m.)
```

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted:  3/15/16      /s/  Liza W. Dubois
                         LIZA W. DUBOIS, LCR, CRR