STEVEN W. MYHRE
Acting United States Attorney
District of Nevada
State Bar No. 9635
NICHOLAS D. DICKINSON
NADIA J. AHMED
PETER S. LEVITT
Assistant United States Attorneys
ERIN M. CREEGAN
Special Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
steven.myhre@usdoj.gov
nicholas.dickinson@usdoj.gov
nadia.ahmed@usdoj.gov
erin.creegan@usdoj.gov

*Representing the United States*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 2:16-CR-00046-GMN-PAL |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| GERALD A. DELEMUS | |
| Defendant. | |

**CERTIFICATION**:  The undersigned certify that this pleading is timely filed.

Pursuant to LCR 32-1(d), the United States, by and through the undersigned, respectfully submits its Sentencing Memorandum in the above-captioned case.

## I.    Summary.

For reasons set forth in full below, and pursuant to the plea agreement entered in this case, the government recommends that the Court impose a sentence that includes imprisonment for 72 months, as well as three years of supervised

release, to run concurrent as to each count of conviction.[1]   The recommended sentence falls squarely within the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") calculation and "as a whole" is fully justified and warranted in light of the sentencing factors contained in 18 U.S.C. § 3553(a).

## II.   Facts.

### A.   Procedural Posture.

Gerald A. DeLemus ("DeLemus") was charged in a Superseding Indictment returned on March 2, 2016, charging him with ten counts:

- Conspiracy to Commit an Offense Against the United States (Count 1 – 18 U.S.C. § 371);

- Conspiracy to Impede or Injure a Federal Officer (Count 2 – 18 U.S.C. § 372);

- Assault on a Federal Officer (Count 5 – 18 U.S.C. §§ 111(a)(1), (b) and 2);

- Use and Carry of a Firearm in Relation to a Crime of Violence (Counts 6, 8 and 15 – 18 U.S.C. §§ 924(c) and 2);

- Threatening a Federal Law Enforcement Officer and Aiding and Abetting (Count 8, 18 U.S.C. §§ 115(a)(1)(B) and 2);

- Obstruction of the Due Administration of Justice (Count 12 – 18 U.S.C. §§ 1503 and 2);

- Interference with Interstate Commerce by Extortion (Count 14 – 18 U.S.C. §§ 1951 and 2); and

- Interstate Travel in Aid of Extortion (Count 16, 18 U.S.C. §§ 1952 and 2).

---

[1]   The statutory maximum sentence for Count One is five (5) years, and twenty (20) years for Count Two.   Because the government is recommending a 72-month sentence of imprisonment, 60 months would run concurrent with Count One.

All of the charges arise from the events surrounding April 12, 2014, where federal law enforcement officers from the BLM and National Park Service suffered a massive armed assault and extortion by supporters of Cliven Bundy.

On August 25, 2016, DeLemus entered a plea of guilty to Count One (Conspiracy to Commit an Offense Against the United States) and Count Sixteen (Interstate Travel in Aid of Extortion) pursuant to a plea agreement entered the same date.  The plea agreement sets forth the terms of agreement between the parties, including a provision for a recommended sentence of 72 months imprisonment.  Following the plea colloquy, the Court accepted DeLemus's guilty plea and set sentencing for December 1, 2016.

Before the sentencing hearing, DeLemus fired his court-appointed attorney, claiming that there was a conflict and indicating his intent to file a motion to withdraw his plea.  New counsel was appointed and sentencing was continued.

On January 13, 2017, DeLemus filed a motion to withdraw his plea.  ECF No. 1298.  The government filed its Response (ECF No. 1769) and, on May 9, 2017, the Court denied the motion. ECF No. 1953.  DeLemus subsequently filed a Motion to Reconsider the denial of his initial motion.  ECF No. 1974.  That motion is still pending as of the filing of this Memorandum.

The plea agreement is before the Court and need not be recounted here in detail, except to note that it contains the standard provisions regarding the agreed upon guideline calculation (Level 26) and a government recommendation of 72

months' imprisonment.  The agreement further allows DeLemus to argue for a sentence below the guidelines, based on § 3553(a).

### B.    The Facts Giving Rise to the Offense Conduct.

Having presided over Trial 1, the Court is well-aware of the evidence as it relates to Cliven Bundy's failure to pay grazing fees for over twenty years, conduct that ultimately prompted the BLM to seek court orders authorizing the removal of Bundy's cattle from the public lands near Bunkerville, Nevada.  To thwart the removal, Bundy issued a call to arms across social media, appealing to like-minded anti-federal ideologues who believed that a superior show of force would back down the BLM.  This prompted hundreds of ideologues from across the country to travel to Bundy Ranch to support Bundy, bringing their weapons, body armor, and ammunition to Nevada in the hope of confronting federal agents.

By April 12, 2014 hundreds of Bundy supporters answered the calls-to-arms against the BLM.  As the gunmen arrived, Bundy and his co-conspirators organized them into so-called "militia camps," deploying them from there into armed security checkpoints and patrols.

On April 12, Bundy rallied his Followers and commanded them to take his cattle back, unleashing them to converge upon and assault the BLM's impoundment site located in the Toquop wash, near Bunkerville.  The evidence shows that officers confronted an angry array of more than 270 people in the wash, the group being backed by gunmen brandishing or carrying rifles and firearms in the wash, or perched on high ground in over-watch positions, or in concealed sniper positions

aiming their assault rifles from a highway bridge.  The officers were positioned on low ground in the wash, guarding a makeshift gate that had been erected under one of the highway overpasses, protecting the entrance to the impoundment site where the cattle were corralled.

The officers guarding the gate that day, almost to a person, thought either they, or unarmed civilians, were going to die.  Many of the officers, some of them combat veterans, remain profoundly affected to this day.  Witnesses have described the level of violence as so intense that something as innocent as the backfire of vehicle would have set off a firefight with the gunmen.

Because of the dangerously high threat of violence, the officers were in an impossible situation and backed down from the gate – just as Cliven Bundy had planned.  The federal officers then evacuated the site, leaving the impounded cattle to Bundy's followers, who released them back to Bundy.

### C.  Victim Impact.

During Trial 1, Special Agent Michael Johnson (February 15, 2017, Day 6, Pg. 19, 24-26) testified that he felt threatened and was concerned about the safety of his fellow officers.  According to Johnson, this event was different from anything else he has ever experienced in his law enforcement career.

Others testified similarly:

Ranger Logan Briscoe:   (February 16, 2017, Day 7, Pg. 58-59, 63-64): Testified that he feared for his life and for the lives of his fellow officers.  The assault affected how he performed his job after April 12, 2014.

Special Agent Mark Brunk (February 27, 2017, Day 8, Pg. 207):  Testified that this was the second scariest experience that he ever faced as a law enforcement officer, the first being an officer involved shooting.

Ranger Patrick Apley (February 28, 2017, Day 9, Pg. 82, 86):  Testified that he feared for his safety and for the safety of his fellow officers.   On scale of 1-10 for fear, he rated it a 7 and compared it to his combat experience during the first Gulf War.  The assault affected how he performed his job after April 12, 2014.

Officer Tara MacBride (March 2, 2017, Day 11, Pg. 284, 289):  Testified that she feared for her safety and the safety of her fellow officers.  She did not feel safe until she arrived in Las Vegas.  She had been a law enforcement officer for eight years and April 12 was the most threatened she had ever felt.

Keith Whitworth (March 1, 2017 Day 10, Pg. 35-36):  Testified that April 12 was the most dangerous event in his law enforcement career.  He stated that there were women and children within five yards of the gunman.

Special Agent Rand Stover (February. 14, 2017 Day 5, Pg. 175):   Testified that he was in fear for his safety and the safety of his fellow officers.

Special Agent Robert Shilaikis (March 1, 2017, Day 10 Pg. 55-56):  Testified that he was in fear for his own safety and the safety of his fellow officers.   He compared the events of April 12 to serving in four different war zones.

Officer Brandon Novotny (March 2, 2017, Day 11, Pg. 237-38):  Testified that he was in fear.  On a scale of one to 10 in terms of dangerousness, this was a 10.

Ranger David Keltner (March 2, 2017, Day 11, Pg. 157-58):  Testified that he was worried that the militia would open fire.  He thought he was going to see a friend's head explode.  He stated that post standoff, it's been hard.  It sometimes affects his ability to focus on other things.

Ranger Michael Carpenter: April 5, 2017, Day 25, Pg. 142):  Testified that he felt his life was threatened and the life and safety of his fellow officers.

Ranger Gregory Johnson (March 6, 2017, Day 12, Pg. 35, 48):  Testified that he feared for his safety.  He felt like at best he was going to get shot and, possibly was going to die that day.

Special Agent Adam Sully (February 15, 2017, Day 6, Pg. 143-44):  Testified that he was the most concerned he had ever been as a law enforcement officer and thought about leaving behind his children.

Special Agent Scott Swanson:  (March 2, 2017, Day 11, Pg. 44):   Testified that he felt that he might not survive the events on April 12.   At one point, he said a prayer and asked God to take care of his wife and children if he didn't make it out of the wash.

Communications Manager Toni Suminski (February 28, 2017, Day 9, Pg. 242-43):  Testified that April 12 was the most stressful event she has every worked supporting law enforcement.

**D.**	**Post-Assault:  Bundy's Followers Establish Security Around Bundy Ranch to Keep Federal Officers From Arresting Him.**

Immediately after the assault, Bundy and his co-conspirators openly celebrated their use of force, showing the world that not only did they lack remorse

7

for their violent criminal acts – they were proud of them.  In an interview posted to the Pete Santilli Show's YouTube channel on or about April 16, 2014, Cliven Bundy was interviewed by an individual named Peter Rense.  When asked whether the BLM still had officers in the area, Bundy stated, "We the people and the militia definitely rid this place of any of that kind of influence."  *See* https://www.youtube.com/watch?v=dI-3qYTMGgU (last visited February 11, 2016). In the same interview, Bundy expressed dismay that the BLM was allowed to leave with their weapons on April 12:  "we haven't won the war, we've just won one chapter of it."  *Id.*  Bundy's characterization of the assault as part of a larger "war" makes clear that his efforts to thwart and interfere with BLM law enforcement officers would carry on.

In the days following the assault, armed Bundy supporters continued to flock to Bundy Ranch ready to confront federal officers to prevent the arrest of Bundy. To that end, the supporters organized themselves into camps, engaged in reconnaissance missions, manned check points on public roads, and conducted armed patrols of the area around Bundy Ranch to ensure BLM officers were not present and would not return.  Bundy and his conspirators established a firing range on public land which his lead bodyguard used to train other gunmen to protect Bundy and his ill-gotten gains.

On April 17, 2014, a local Channel 8 news reported on the continued armed presence in the area and stated that "Armed protesters continue to surround the Bundy ranch and are even blocking a county road. Some of the supporters

attempted Thursday to keep a Channel 8 news crew from entering the area, despite it being a public road. . . . The armed men say they'll be at the site for weeks to come to defend the Bundy family." The news segment included footage of a Bundy guard blocking access to a public road.

Organized patrols of the public lands continued all through the summer into the fall of 2014. Additionally, evidence shows that telephone lines with roster information were set up, donation pages on the internet continued to be utilized to solicit funds, and gunmen traveled back and forth from other states to do duty at the Ranch. The purpose of these missions was to ensure Cliven Bundy was not arrested and that BLM did not return to the public lands either to impound the cattle or for any other purpose.

### E.    DeLemus's Role in the Conspiracy.

DeLemus, 62, arrived at Bundy Ranch on the evening of April 12, having traveled over 2700 miles by truck from New Hampshire. A former Marine sergeant, DeLemus considered himself to be trained in military tactics and firearms. The evidence suggests that DeLemus brought a .50 caliber machinegun and other assorted firearms, firearms he claims to have "zeroed-in" (i.e. calibrating his sights through a live fire exercise) shortly before arriving at Bundy Ranch. The evidence shows that DeLemus left New Hampshire with the express intent of joining Bundy in a confrontation with federal law enforcement officers. It was only because it took DeLemus 42 hours to drive from New Hampshire to Nevada that he was not present

for the assault on April 12; there is absolutely no evidence to suggest that DeLemus would not have been an active participant had he arrived in time.

Once on the ground at Bundy Ranch, DeLemus assumed a leadership position, organizing the militia camps, arranging for logistics support, conducting firearms training, leading patrols, and establishing security checkpoint at point of entry to the Bundy Ranch where Cliven Bundy resided. DeLemus stayed at Bundy ranch for one month.



DeLemus described his role in a public interview with a local news outlet, boating: "What we are out here to do is to keep the Federal Government, that is acting in a lawless nature, from shooting the Bundy's or anyone else. If in fact, the Federal Government and their agencies come after the Bundy's and shoot at them, we will defend the Bundy's. Absolutely, and we have all the capability in the world to do that. Do we want to do that? Absolutely not." DeLemus continued "what we will do is we will all die right here in place to defend the Bundy's and the freedom of this country. And if nobody else in this country will stand up, by god, you can look around here and see what true heroism is."



DeLemus also recruited others for Bundy. In a video interview with Stewart Rhodes, the leader of a group called the Oath Keepers, a group that aligns itself with the so-called Patriot Movement, DeLemus encouraged those with guns and training to come to Bundy Ranch, warning that they may not go home (after a violent confrontation with the federal government). In the video, DeLemus admits that he traveled to Bundy Ranch to go on "offense," claiming that "we will stand and we will fight and we will die if the government tries to oppress the Bundys." DeLemus further stated that "freedom is worth fighting for and worth dying for" and that he would rather the "other guys (referring to law enforcement) die trying to take it, but if that sacrifice needs to be made, by God, we'll make it." DeLemus added: "what we are fighting here is a lawless government."

Rhodes referred to Bunkerville as "sacred ground" because there, Americans stood up "because even though we didn't have to fight, we faced them off." Rhodes called this action "the battle of Bunkerville." DeLemus agreed and said that he

needed the support from other veterans: "if you can get out here, come out, we can certainly use the help.  But bring your gear, as much as you possibly can."  YouTube: "Bundy Ranch: We Came Risking Never Coming Home Jerry DeLemus."



DeLemus provided an armed escort for Ryan Bundy as he tended to cattle that had been extorted from the law enforcement officers. DeLemus posted the following to Facebook, explaining his role at Bundy Ranch, expressing his strong anti-federal sentiment and making a pitch to be elected local Sheriff in his home county:



**Jerry DeLemus for Sheriff Strafford County NH**
July 16, 2014 · ⊘ · 🌐                                    👍 Like Page

**Bundy Ranch**
July 16, 2014 in Bunkerville, Nevada

The importance of electing a Constitutional Sheriff became apparent to me at the Bundy Ranch. I was asked to supply escort to Ryan Bundy and another cowboy as they towed their stock trailer with their horses to round up calves the Bureau of Land Management (BLM) had left abandoned after they separated them from their mothers. As I followed the pickup towing the stock trailer with my truck with 7 of us to provide protection to these cowboys it dawned on me they were just trying to go to work and we had to protect them from our own government. It really hit me something is terribly wrong with our country. The problems that occurred their could have been handled by the County Sheriff if he had upheld his oath to the Constitution. Fear of losing federal grants tends to paralyze those departments that are addicted to them. That won't be a problem Strafford County New Hampshire citizens will experience if I am elected Sheriff.

**F.     DeLemus's Offense Conduct – In His Own Words.**

DeLemus's offense conduct centers principally on the aftermath of the April 12 assault and is best described by his own words as recorded in an interview that took place on May 1, 2015, in Boston, Mass. and obtained in connection with an FBI undercover operation ("UCO").  The Court is already familiar with the UCO from Trial 1, having heard the testimony of FBI undercover agent Charles Johnson, who explained that he interviewed a number of targets of the investigation, posing as a documentary filmmaker, producing a documentary on the so-called Bundy Ranch standoff.  The documentary, fictitiously referred to as "America Reloaded," was pitched to the targets, including DeLemus, as an opportunity to "tell their story."

13

During his UCO interview, DeLemus described the extent of his involvement with Bundy Ranch and his mindset behind it. The DeLemus interview is submitted and filed separately as Exhibit 1 (sealed) to this Memorandum.  In brief summary, DeLemus related the following:

On April 8, 2014, DeLemus read an article on the Bundys on the Drudge Report containing links to videos.  He became immediately "convicted" to call Cliven Bundy and offer support.  Bundy told him that the BLM had armed people closing him off from his land that he had since 1877.  When DeLemus asked Bundy how he could help, Bundy responded that he needed bodies. DeLemus understood that that the numbers would make a difference.  Bundy told him that BLM had firearms.  As a former Marine, DeLemus claimed that he would go to Bundy Ranch prepare for that.

DeLemus admitted that he took firearms with him but refused to divulge the types of weapons, hinting, however, that they were very powerful.  Believing that the events of Waco taught him that the government had the willingness to kill women and children, DeLemus stated that he left New Hampshire determined that he would not let the BLM intimidate the Bundy family.

DeLemus admitted that he brought others with him, including his son, and that he and his party drove for 42 hours, covering over 2700 miles on their way to Bundy Ranch from New Hampshire.  On April 12, he and his party stopped in Utah to "zero-in" his weapons, which DeLemus described as live firing the weapons to calibrate the sites.  As they stopped in Utah, DeLemus's group decided that they

would wait until dark before completing the trip to Bunkerville. They arrived after the assault and extortion had taken place.

Much of the UCO interview about the events following his arrival at Bundy Ranch consists of him espousing his political and social ideology, which can be generally described as anti-federal government and, specifically, anti-BLM. According to DeLemus, he traveled to Bundy Ranch to "stop a lawless government action against citizens." That he was willing to shed blood is evidenced by his statement that he was willing to lose his life in support of Bundy.

When DeLemus arrived at Bundy Ranch, he took a leadership role in organizing the largest camp of Bundy supporters, "Camp Liberty." DeLemus described how he moved the camp to a less vulnerable positon and organized the supporters into patrols and security checkpoints. DeLemus described the supporters at Camp Liberty as "his flock," and that they had a lot of confidence in him.

DeLemus stated that his purpose at Bundy Ranch was to "protect" the Bundy family, something he understood could involve violence. He stated that he was not a member of a militia group, but that he knew that, by his presence at Bundy Ranch, "this could go sideways and turn violent." And while claiming he wished to avoid bloodshed, he stated that he was quite prepared to take a life.

During his UCO interview, DeLemus took every opportunity to recruit and incite others to Bundy's cause. He advanced the false narrative perpetuated by the Bundy family that the BLM was a "thug operation" that "chased fifty families out

of Bundy's county." He claimed that BLM officers pointed firearms at women and children. He incited others at Camp Liberty by telling them that federal officers would kill everyone in the camps at Bundy Ranch.

DeLemus also claimed that through their intelligence gathering, he knew the locations of BLM officers in Las Vegas after they evacuated the impoundment site. Investigative information shows that Bundy supporters were, in fact, observed conducting surveillance on the hotels where BLM officers were staying during the immediate aftermath of their evacuation of the impoundment site.

## III.    Legal Standard.

Proper sentencing procedure requires that, before imposing sentence, the district court: (1) correctly calculate the Sentencing Guidelines range; (2) treat the Guidelines as advisory; (3) consider the 18 U.S.C. § 3553(a) factors; (4) choose a sentence that is not based on clearly erroneous facts; (5) adequately explain the sentence; and (6) not presume that the Guidelines range is reasonable. *United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir. 2008). When the court imposes a sentence within the Guidelines range, "'it is probable that the sentence is reasonable'" because the court's application of the § 3553(a) factors accords with the Sentencing Commission's independent application of those factors in the "mine run of cases." *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).

It would constitute procedural error, however, for the court to "attach [ ] a presumption of reasonableness to the Guidelines range or weight[ ] the Guidelines

range more heavily than other § 3553(a) factors." *Carty*, 520 F.3d at 994.  The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also consider the § 3553(a) factors "in determining the appropriate sentence." *Nelson v. United States*, 550 U.S. 350, 352 (2009).

## IV.    Under the USSG, The Total Offense Level Should Be 29.

The PSR and the Plea Agreement do not agree on the Total Offense Level: the Plea Agreement calls for Level 26, and the PSR calls for 25.  The difference appears to be in the application/non-application of what the PSR refers to as "matters of departure."  PSR at 25, para. 105.

For the reasons discussed below, the Total Offense Level should be 29 because: 1) the Court should apply the agreed upon adjustment of +5 levels under U.S.G. § 3A1.4 and the -4 level variance for early resolution of the case; and 2) DeLemus has forfeited the agreed upon -3 level adjustment for "early acceptance" because he filed a motion seeking to withdraw his plea.

### 1.    The PSR Calculation Does Not Account For the Agreed Upon Terrorism Adjustment Under Section 3A1.4 and an Agreed Upon Downward Adjustment of Early Resolution of the Case.

The Plea Agreement calls for an agreed upon upward adjustment of 5 levels under U.S.S.G. § 3A1.4, and a downward adjustment of 4 levels for early resolution of the case.  This yields a net difference of a +1 levels (upward) adjustment to the Total Offense Level.  The Court should apply the adjustment and the variance as indicated because they were agreed upon by the parties and were integral to the plea negotiations in this case.

Further, while Section 3A1.4 applies expressly to federal crimes of terrorism, Commentary Note 4 to that section notes that "there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. Sec. 2332b(g)(5)(B) . . . ." This is such a case.

DeLemus, through words and action, has shown that his intention in joining this conspiracy was to coerce the federal government. He stated as much in a video interview with a local television studio: "What we are out here to do is to keep the Federal Government, that is acting in a lawless nature, from shooting the Bundys or anyone else. If, in fact, the Federal Government and their agencies come after the Bundy's and shoot at them, we will defend the Bundy's. Absolutely, and we have all the capability in the world to do that. Do we want to do that? Absolutely not." DeLemus continued "what we will do is we will all die right here in place to defend the Bundy's and the freedom of this country. And if nobody else in this country will stand up, by god, you can look around here and see what true heroism is." Doublespeak aside, DeLemus's public warning to the BLM is very clear—if you don't do what we want, there will be violence.

Similarly, in the Stewart Rhodes interview, DeLemus encouraged those with guns and training to come to the ranch, and that they may not go home (after a violent confrontation with the federal government). In the video, DeLemus admits

that he traveled to Bundy Ranch to join the "offense" at Bundy Ranch, and that "we will stand and we will fight and we will die if the government tries to oppress the Bundys." DeLemus stated that "freedom is worth fighting for and worth dying for" and that he would rather the "other guys (referring to law enforcement) die trying to take it, but if that sacrifice needs to be made, by God, we'll make it." DeLemus continued by adding "what we are fighting here is a lawless government," and "if you can get out here, come out, we can certainly use the help. But bring your gear, as much as you possibly can." He echoed these same beliefs and admissions his UCO interview.

In sum, DeLemus's purpose in traveling 2,700 miles—to come to the aid of someone he never met, over cattle in which he had no interest, and spending his own funds in the process—was to contribute to Bundy's show of force, or, as he stated, to "protect him." As he acknowledges, he was prepared to die if the officers tried to take any law enforcement action against Bundy. The reason DeLemus did it in such a public way was to send a message to federal officers that he and others were at Bundy Ranch, armed and prepared to confront, to influence and coerce them into not taking action in order to avoid a confrontation.

If, however, the Court does not apply a +5 level adjustment under U.S.S.G. § 3A1.4, then it then should **not** apply the -4 level variance for early resolution as these two adjustments were intended by the parties to be considered in tandem when calculating the Guideline Range.

2.   **The Defendant Should Not Receive -3 level Adjustment For Early Acceptance of Responsibility Because He Attempted to Withdraw His Plea.**

As discussed above, DeLemus attempted unsuccessfully to withdraw his plea in abrogation of the plea agreement. *See* Plea Agreement, page 8, para. C;  ECF No. 1298.  At the time of this filing, he continues to press to withdraw his plea.  ECF No. 1953.  While DeLemus will most likely be heard to complain that this Court has no right to "punish" him for "exercising his rights," the fact remains: 1) that the government promised DeLemus the -3 "early acceptance" reduction *in exchange for* not having to expend time and resources on his prosecution; and 2) that DeLemus's filing of a motion to withdraw *and* a motion for reconsideration have forced the government to respond, thereby expending the very resources it had bargained on saving. This, then, is not a question of DeLemus exercising his right to file motions; rather, it is a question of the government being deprived of *its* side of the bargain. Accordingly, the Court should not give DeLemus the -3 level benefit for which he bargained, as that "acceptance of responsibility" reduction was contingent upon him *not* withdrawing his plea.

## V.   72-months' Imprisonment Is Consistent with the Section 3553(a) Factors.

Section 3553(a) requires the Court to impose a sentence "sufficient but not greater than necessary to comply" with the factors articulated in subparagraph 2. 18 U.S.C. § 3553(a).  The government submits that the overall nature of the offense and the characteristics of the offender, when combined with the circumstances

20

under which the offense was committed, justify a sentence of 72-months imprisonment and does no violence to the Guideline calculation in this case.

**A.** **The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense.**

A sentence of 72 months' imprisonment is more than reasonable when considering the seriousness of the conduct at issue. DeLemus committed a crime of violence (ITAR) in concert with Cliven Bundy and his followers in order to threaten and coerce federal law enforcement officers from carrying out their lawful duties. In so doing he showed no respect for the law, for the rule of law, for law enforcement officers, for court orders, or for the community.

DeLemus was highly motivated to commit the crime and to confront law enforcement officers with violence. He admitted that he drove for 42 hours and over 2700 miles from New Hampshire, hauling firearms and other supporters by truck in order to aid Cliven Bundy's efforts to thwart federal officers from impounding Bundy's trespass cattle, only stopping so he could "zero-in" his weapons so they could be used effectively to, as he put it, "stop a lawless government action against citizens." Like Bundy, DeLemus became a law unto himself and he was determined to use force to enforce his view of the law.

DeLemus helped to militarize Bunkerville after the assault, becoming a leader and organizer of "Camp Liberty" at Bundy Ranch and organizing patrols and checkpoints after April 12 to prevent federal officers from taking any law enforcement action against Bundy. His actions encouraged and incited others to

take up arms against law enforcement officers, increasing the risk of a violent confrontation with federal law enforcement.

At base, DeLemus brought guns to Nevada and applied his military training and expertise to advance a criminal enterprise. A 72-month term of incarceration properly reflects the seriousness of these violent acts.

### B.    The Need for the Sentence to Promote Respect for the Law and to Afford Adequate Deterrence.

A 72-month sentence will promote respect for the law and afford an adequate deterrence to others. Cliven Bundy and Gerald DeLemus were very public in flaunting their disrespect for the law. They affiliate themselves with the so-called Patriot Movement, which ascribes to the belief that the federal government is an enemy of the constitution that must be dealt with by force. DeLemus has confirmed this belief system by his actions and words.

General deterrence is one of the prescribed goals of every sentencing. 18 U.S.C. § 3553(a)(2)(B); *see also United States v. Onuoha*, 820 F.3d 1049, 1055 (9th Cir. 2016 (noting that the government has "an interest in gaining a trial conviction to show others that such conduct will result predictably in conviction and a serious penalty of incarceration"); *United States v. Dyer*, 216 F.3d 568, 570 (7th Cir. 2000) (noting one principal objective of criminal punishment is deterrence). General deterrence is a significant factor in the present case. Further, general deterrence depends upon the public seeing some consequence for criminal conduct - not only among potential wrongdoers who may be deterred from committing crimes, but also

22

among law-abiding citizens who need assurance that the criminal justice system will do its utmost to protect law enforcement from harm.

DeLemus's actions at Bundy Ranch showed that he intends to recruit others to his belief system. The sentence in this case should send a clear message that the Bundy Ranch standoff is a felony crime of violence, not a patriotic act to be emulated. Officers' lives were placed in jeopardy by the violent confrontation orchestrated by Bundy and perpetuated by DeLemus. A sentence of 72 months' imprisonment will send the appropriate message that violence used to impede and thwart legitimate law enforcement activities will not be tolerated.

**WHEREFORE**, for all the foregoing reasons, the Court should impose a sentence of 72 months imprisonment per the plea agreement entered in this case.

**DATED** this 23rd day of May, 2017.

Respectfully,

STEVEN W. MYHRE
Acting United States Attorney

*/s/ Steven W. Myhre*

_____
NICHOLAS D. DICKINSON
NADIA J. AHMED
PETER S. LEVITT
Assistant United States Attorneys
ERIN M. CREEGAN
Special Assistant United States Attorney

*Attorneys for the United States*

23

## <u>CERTIFICATE OF SERVICE</u>

I certify that I am an employee of the United States Attorney's Office.  A copy of the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was served upon counsel of record, via Electronic Case Filing (ECF).

**DATED** this 23rd day of May, 2017.


/s/ Steven W. Myhre
_____
STEVEN W. MYHRE
Acting United State Attorney

# Exhibit 1